JFM:WES/JAG
F.#2010R00609

**M10- 507**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

MICHAEL METTER and
STEVEN MOSKOWITZ,

               Defendants.

- - - - - - - - - - - - - - X

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
<u>FOR ARREST WARRANTS</u>

(18 U.S.C. § 371)

EASTERN DISTRICT OF NEW YORK, SS:

      THOMAS MCGUIRE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

      Upon information and belief, there is probable cause to believe that in or about and between January 2007 and May 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MICHAEL METTER and STEVEN MOSKOWITZ, together with others, did knowingly and willfully conspire to:

      (a) use and employ manipulative and deceptive devices and contrivances contrary to Title 17, Code of Federal Regulations, Section 240.10b-5 ("Rule 10b-5"), by (i) employing a device, scheme, and artifice to defraud; (ii) making untrue statements of material fact and omissions of material fact necessary in order to make statements made, in the light of the circumstances under which they

were made, not misleading; and (iii) engaging in acts, practices, and courses of business which would and did operate as a fraud and deceit upon persons, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, and in connection with the purchase and sale of securities issued by Spongetech Delivery Systems, Inc. ("Spongetech"), contrary to Title 15, United States Code, Sections 78j(b) & 78ff, and Rule 10b-5; and

(b) corruptly influence, obstruct and impede the due and proper administration of the law under which a pending proceeding, specifically an investigation by the Enforcement Division of the United States Securities and Exchange Commission ("SEC"), was being had before the SEC, contrary to Title 18, United States Code, Section 1505.

(Title 18, United States Code, Section 371.)

The source of your deponent's information and the grounds for his belief are as follows:

<u>BACKGROUND</u>

1.   I have been a Special Agent with the FBI for approximately six years.  The facts set forth in this complaint and affidavit are based on my review of documents, including transcripts of witness testimony, and interviews of individuals. In the portions of this complaint and affidavit that describe the contents of documents or statements of witnesses, they are reported in substance and in part, unless otherwise indicated.

2.   Because I submit this complaint and affidavit for the limited purpose of establishing probable cause to arrest the

defendants, I have not set forth all facts known to me about this investigation and case.

## RELEVANT ENTITIES AND INDIVIDUALS

3. RM Enterprises International Ltd. ("RM Enterprises") is a Delaware corporation that maintains its principal offices in New York, New York. At all relevant times, RM Enterprises had three shareholders: Frank Lazauskas and the defendants MICHAEL METTER and STEVEN MOSKOWITZ.

4. Spongetech is a Delaware corporation that maintains its principal offices in New York, New York.[1] Spongetech designs, produces, markets, and sells various cleaning care products, including pre-loaded soap sponges such as the SpongeBob SquarePants soap-filled bath sponges for children. Its fiscal year ends on May 31.

5. Spongetech is a publicly traded company that, up until early October 2009, was traded on the Over the Counter Bulletin Board ("OTCBB").[2] At all relevant times, however, a significant percentage of Spongetech's voting stock was owned by

---

[1] The company typically spells its name with a lower case "t" but generally uses an upper case "t" when referring to a particular product with the same name.

[2] The SEC suspended trading for Spongetech stock on or about October 5, 2009. That suspension expired on or about October 16, at which time the stock began trading only in the grey market. The "grey market" is a market that contains securities that are not listed on any stock exchange, the OTCBB, or the so-called "pink sheets."

RM Enterprises, and a large amount of Spongetech's voting stock was owned directly by Frank Lazauskas and the defendants MICHAEL METTER and STEVEN MOSKOWITZ.   For example, the following ownership figures are set forth in Spongetech's SEC Form 10-KSB for the year ended May 31, 2008:[3]

| Name | Common Stock Owned (Percentage) | Class B Stock Owned (Percentage) | Percentage of Total Vote |
|------|------|------|------|
| RM Enterprises | 257 million (49%) | - | 17% |
| METTER | 8 million (2%) | 4 million (40%) | 27% |
| MOSKOWITZ | 6 million (1%) | 4 million (40%) | 27% |
| Lazauskas | 11 million (2%) | 2 million (20%) | 14% |

Because these ownership amounts, when taken together, constituted approximately 85% of Spongetech's voting stock, Lazauskas, METTER, and MOSKOWITZ together controlled Spongetech.

6.   Since May 2001, the defendant MICHAEL METTER has been Spongetech's Chief Executive Officer and President. According to METTER's sworn testimony before the SEC, he oversees the marketing and sales of Spongetech and, at least since about the spring of 2009, he has been present at Spongetech's office every work day, on a full-time basis.   From June 2001 through September 2007, METTER also served as President of RM Enterprises.   According to Spongetech's public filings, METTER

---

[3] According to the SEC Form 10-KSB, these ownership amounts are as of July 28, 2008.   For the sake of simplicity, the exact amounts and percentages set forth in the SEC Form 10-KSB have been rounded.

earned a bachelor's degree in marketing and accounting, and a master's degree in finance.  He resides in Greenwich, Connecticut.

7.   Since June 1999, the defendant STEVEN MOSKOWITZ has been Spongetech's Chief Operating Officer, Chief Financial Officer, Chief Accounting Officer, Treasurer, and Secretary. MOSKOWITZ also served as Chief Financial Officer of RM Enterprises.  According to Spongetech's public filings, MOSKOWITZ earned a bachelor's degree in management.  He resides in Queens, New York.

8.   At all relevant times, Spongetech has had a relatively small number of employees.  In its SEC Form 10-KSB for the year ended May 31, 2008, Spongetech disclosed that as of the report's filing (August 29, 2008), Spongetech had 24 part-time employees, three of whom comprised the "business and sales management team" and 21 were "staff."  According to an undated Spongetech organizational chart that was furnished by Spongetech to the SEC in or about late 2009, there are approximately 20 employees, including the defendants MICHAEL METTER and STEVEN MOSKOWITZ.[4]

---

[4] According to the defendant STEVEN MOSKOWITZ, one of the individuals on the organizational chart, Bill Young, is not a Spongetech employee but rather an "agent" who is responsible for Spongetech's investor relations.

## THE FRAUDULENT SCHEME

9.    In or about and between January 2007 and May 2010, the defendants MICHAEL METTER and STEVEN MOSKOWITZ, along with others, executed a scheme to defraud Spongetech's existing and potential investors by publicly reporting false and grossly overstated sales figures.  Specifically, METTER and MOSKOWITZ publicly reported that Spongetech had secured purchase orders from and/or had made sales to the following five customers: SA Trading Company, US Asia Trading, Dubai Export Import Company, New Century Media, and Fesco Sales Corp.  The amounts of these orders and sales were material.  Indeed, in some instances, Spongetech reported that sales to these five customers constituted as much as approximately 99% of Spongetech's reported revenue.  The five customers, however, do not in fact exist and therefore no such purchase orders could have been secured and no such sales could have been made.

## SPONGETECH'S FALSE SEC FILINGS AND FRAUDULENT PRESS RELEASES

10.   From in or about and between January 2007 and May 2010, the defendants MICHAEL METTER and STEVEN MOSKOWITZ filed or caused to be filed multiple reports with the SEC that disclosed to existing and potential investors false and grossly overstated sales figures.  During that same period of time, METTER and MOSKOWITZ issued or caused to be issued numerous press releases — typically via the Internet — that disclosed to

6

existing and potential investors false and grossly overstated sales figures, as well as phony purchase orders and other false information.  Set forth below are several SEC filings and some of the press releases:

I.   April 30, 2007

11.  On April 30, 2007, Spongetech issued a press release announcing that it had signed a "letter of intent" to sell 1.5 million sponges to "SA Trading Group Corp.," which Spongetech described as "an exporter of automotive products in South America."  The press release also quoted the defendant STEVEN MOSKOWITZ: "This is an exciting time for [Spongetech].  We look forward to finalizing our agreement with SA Trading Group Corp (sic) and beginning our sales and distribution into South America."

12.  On April 30, 2007, the volume of trading in Spongetech stock increased from 376,790 shares the prior day to 1,688,731, and the stock price rose from $0.17 to $0.23, a 35% increase.

II.  May 9, 2007

13.  About one week later, on May 9, 2007, Spongetech issued a press release announcing that it had signed an agreement with SA Trading Group Corp., and that the agreement "starts with an order of $1,500,000" of product that would be delivered between September 15 and October 10, 2007.  This press release

also quoted the defendant STEVEN MOSKOWITZ touting the purchase order.

14.   On May 9, 2007, the volume of trading in Spongetech stock increased from 58,300 shares the prior day to 1,343,977, and the stock price rose from $0.15 to $0.22, a 47% increase.

III. <u>May 15, 2007</u>

15.   About one week later, on May 15, 2007, Spongetech issued a press release announcing that it had received a second purchase order from SA Trading Group Corp., and that the order was for 500,000 units representing $3,000,000 in sales.  The defendant STEVEN MOSKOWITZ commented in the press release as follows: "I am really pleased with this second order and the way [Spongetech] is starting to roll with sponge technology and the new products we are working on.  We hope to have one or two new Spongetech products ready in the next few weeks."

IV. <u>August 21, 2007</u>

16.   On August 21, 2007, Spongetech issued a press release announcing that it had received a third purchase order from SA Trading Group Corp., and that the order was for 375,000 units representing $3,755,000 in sales.  Again, the defendant STEVEN MOSKOWITZ was quoted, trumpeting the purchase order and corresponding sales.

V.   <u>December 20, 2007</u>

17.   On December 20, 2007, Spongetech issued a press release announcing that it had received another purchase order from "SA Trading Company" (not "SA Trading Group Corp."). The press release indicated that the order was for $2.5 million of product, and that Spongetech would be fulfilling the order during the first quarter of 2008. The defendant STEVEN MOSKOWITZ was quoted as saying that "[t]his reorder is a good sign that there exists significant room for expansion and growth in the South America aftermarket parts industry."

18.   The December 20, 2007 press release also described a conversation that the defendant STEVEN MOSKOWITZ allegedly had with "Anthony Gonzales" (identified in the press release as the President of SA Trading Company), and included positive comments purportedly made by Gonzales about Spongetech.

VI.   <u>January 31, 2008</u>

19.   One month later, on January 31, 2008, Spongetech issued a press release announcing that "SA Trading LCC" (not "SA Trading Group Corp." or "SA Trading Company") had placed an order for a new Spongetech pet care product known as Pet Sponge. The press release included a lengthy quote from the defendant STEVEN MOSKOWITZ that ended with the following statement: "We already have one sizeable Pet Sponge product order on the books and we will be ramping up production for this product in the very

9

near future.  With support from companies like SA Trading, we should add significant new incremental revenues for [Spongetech] in 2008 and beyond."

VII.  <u>February 29, 2008 (SEC Form 10-QSB)</u>[5]

20.  In its SEC filing for its third quarter ended February 29, 2008, Spongetech reported nine-month sales of approximately $1.6 million, more than 28 times the amount of sales generated during Spongetech's entire preceding fiscal year.[6]  Spongetech claimed that the increase in sales was attributable to its "improved marketing campaign, including sales from [Spongetech's] website."

21.  Both of the defendants MICHAEL METTER and STEVEN MOSKOWITZ signed the SEC filing for the quarter ended February 29, 2008.  In addition, METTER and MOSKOWITZ, as Chief Executive Officer and Chief Financial Officer, respectively, certified pursuant to 18 U.S.C. § 1350 that the information contained in the SEC filing fairly presented, in all material respects, Spongetech's financial condition and result of operations.

---

[5] Spongetech's February 29, 2008 SEC Form 10-QSB was filed on April 15, 2008.

[6] For the year ended May 31, 2007, Spongetech reported annual sales of only $55,112.

VIII. **March 4, 2008**

22. On March 4, 2008, Spongetech issued a press release announcing a $2,750,000 re-order from "U.S. Asia Distribution Company, Inc." (not "US Asia Trading"). The press release reported that delivery of an initial order, for 10,000 units, was made in December 2007, and that those units sold out in 25 days. Spongetech announced that the $2,750,000 re-order was for 250,000 units, which would be delivered between August and December 2008.

23. The March 4, 2008 press release also identified "Tom Chang" as the Chief Executive Officer of U.S. Asia Distribution Company, Inc. The press release reported that Chang said "there was great acceptance and enthusiasm of the Spongetech Auto Care Products" and that Chang "expects the same enthusiasm as they begin selling the products on TV in Australia."

24. The March 4, 2008 press release also quoted the defendant STEVEN MOSKOWITZ: "We are pleased with this re-order as we continue to expand and grow [Spongetech]. We are also in the process of testing the SpongeTech Pet Sponge and Puddle Pals in Asia and hope to see the same acceptance and enthusiasm with these products as well."

11

IX.   <u>May 31, 2008 (SEC Form 10-KSB)</u>[7]

25.   In its SEC filing for the year ended May 31, 2008, Spongetech reported annual sales of approximately $5.6 million, which included the $1.6 million referenced in its February 29, 2008 filing.   The $5.6 million represented more than 100 times the amount of sales generated during the preceding fiscal year. Spongetech again claimed that the increase in sales was attributable to its "improved marketing campaign" and website sales.

26.   Spongetech also explained in its SEC filing for the year ended May 31, 2008, that prior to that fiscal year, Spongetech "had historically depended on one customer [TurtleWax] for almost all of [Spongetech's] sales," and that it had now made significant sales to additional customers: "During the fiscal year ended May 31, 2008, three customers [accounted] for an aggregate of approximately 70.5% of sales.   [Spongetech's] three largest customers during the fiscal year ended May 31, 2008 are SA Trading Company, US Asia Trading, and Dubai Export Import Company."[8]

---

[7] Spongetech's May 31, 2008 SEC Form 10-KSB was filed on August 29, 2008.

[8] As will become evident, the five purported customers are frequently referred to by Spongetech and others as having slightly varying names.   For example, US Asia Trading is often referred to by Spongetech and others as "United Asia Trading."

27.   Both of the defendants MICHAEL METTER and STEVEN MOSKOWITZ signed the SEC filing for the year ended May 31, 2008. In addition, METTER and MOSKOWITZ, as Chief Executive Officer and Chief Financial Officer, respectively, certified pursuant to 18 U.S.C. § 1350 that the information contained in the SEC filing fairly presented, in all material respects, Spongetech's financial condition and result of operations.

X.   Other SEC Filings

28.   Since filing its SEC Form 10-KSB for the year ended May 31, 2008, Spongetech has filed with the SEC only three other quarterly or annual reports: Forms 10-QSB for the quarters ended August 31, 2008, November 30, 2008, and February 28, 2009.[9] In each of these SEC filings, Spongetech reported significant sales from one or more of the five customers identified in paragraph 9 above and — with respect to the third quarter ended February 28, 2009 — from sales to Walgreens:

---

[9] As a company whose stock is registered with the SEC, Spongetech is required to, among other things, timely file quarterly and annual reports to the SEC.  But Spongetech has thus far failed to file its Form 10-KSB for the year ended May 31, 2009, and its Forms 10-QSB for the first three quarters of its current fiscal year.

13

| Quarter Ended | Customers | Cumulative Sales (approx.) | Percentage of All Sales |
|---|---|---|---|
| 8/31/08 | SA Trading Company<br>US Asia Trading<br>Dubai Export Import Company | $5.5 million | 67.6% |
| 11/30/08 | SA Trading Company<br>Dubai Export Import Company<br>New Century Media | $17.9 million | 82.9% |
| 2/28/09 | SA Trading Company<br>US Asia Trading<br>Dubai Export Import Company<br>New Century Media<br>Fesco Sales Corp.<br>Walgreens[10] | $31.0 million | 99.4% |

29.   Both of the defendants MICHAEL METTER and STEVEN MOSKOWITZ signed the SEC filings for the quarters ended August 31, 2008, November 30, 2008, and February 28, 2009.   In addition, METTER and MOSKOWITZ, as Chief Executive Officer and Chief Financial Officer, respectively, certified pursuant to 18 U.S.C. § 1350 that the information contained in the SEC filings fairly presented, in all material respects, Spongetech's financial condition and result of operations.[11]

---

[10] In October 2009, Walgreens (also known as "Walgreen Co.") reported that since the inception of its relationship with Spongetech, it had received Spongetech sales invoices totaling only approximately $195,000 and paid Spongetech only approximately $10,000.

[11] On or about January 9, 2009, the defendant MICHAEL METTER appeared on "MoneyTV" for an interview with Donald Baillargeon. A videotape of the interview is publicly available on the Internet at www.youtube.com/watch?v=R-20sZoZLlI.   During the interview, METTER stated, among other things, that "we think that for the year that ends May 31st, 2009, that we are going to make around $7 million on $40 million in sales."   After Mr. Baillargeon commented that such figures were "incredible,"

XI.   <u>Other Press Releases</u>

30.   On September 1, 2009, Spongetech issued a press release announcing that it had "booked" approximately $70 million in orders during the quarter ended August 31, 2009.  The press release quoted the defendant STEVEN MOSKOWITZ as saying, among other things: "We believe that we will continue to see strong growth within [Spongetech] going into the holiday season.  Our brand marketing strategy has been successful thus far and we believe we are positioning [Spongetech] to become the next household brand name."

31.   The September 1, 2009 press release also quoted the defendant MICHAEL METTER discussing Spongetech's failure to file its SEC Form 10-KSB for the preceding fiscal year: "We are in the process of finalizing our Annual Report for the fiscal year ending May 31, 2009 and expect to file the Form 10-K with the SEC shortly.  We remain focused and committed to building [Spongetech] into a globally recognized Company and continue to work towards building shareholder value."  As noted previously, as of the date of this complaint and affidavit, no such SEC filing has been made.

---

METTER discussed, in detail, the nature of some of Spongetech's products, some of which METTER claimed Spongetech was "shipping [to] all over the world."  As noted previously, Spongetech has yet to file its SEC Form 10-KSB for the year ended May 31, 2009, a fiscal year that ended almost one year ago.

## THE FIVE PURPORTED CUSTOMERS DO NOT EXIST

32.  The government's ongoing investigation has revealed that the five Spongetech customers discussed above — SA Trading Company, US Asia Trading, Dubai Export Import Company, New Century Media, and Fesco Sales Corp. — do not exist and, accordingly, that the sales purportedly made to those customers by Spongetech could never have occurred.

I.  The Defendants' Failed Attempts to Establish the Existence of the Five Purported Customers

33.  Beginning on or about September 4, 2009, the Enforcement Division of the SEC issued subpoenas to various entities and individuals, including to the defendants MICHAEL METTER and STEVEN MOSKOWITZ, as part of a formal investigation of Spongetech that was approved by the Commission itself.  At or about the time of the commencement of the investigation, the SEC provided Spongetech with a copy of the formal order of investigation.  Since then, METTER and MOSKOWITZ have corruptly attempted to fabricate the existence of the five purported customers.  Specifically, METTER and MOSKOWITZ have (1) sought to create Internet websites and virtual offices for the customers, (2) furnished phony purchase orders purportedly issued by the customers, and (3) produced questionable documentation purportedly constituting proof of payments by the customers.

A.    <u>Websites and Offices</u>

34.   In or about September 2009, Spongetech provided the SEC with United States addresses for the five purported customers.  The SEC used this information to issue subpoenas to the customers to, among other things, verify their existence.  After those subpoenas were served, the landlords of the addresses that Spongetech provided for SA Trading Company and US Asia Trading informed the SEC that the landlords had no records pertaining to such entities.  The SEC did receive a response from New Century Media, but New Century Media indicated that it was in the business of replicating CDs and DVDs, and that it had no dealings with Spongetech.

35.   *Customer websites*.  In or about November 2009, the SEC subpoenaed documents from Domains by Proxy, a company that offers private domain name registrations for Internet websites.[12] Domains by Proxy provided records showing that domain names for the five customers — SATradingCompany.com, UnitedAsiaTrading.com, DubaiExportImportCo.com, FescoCorp.com, and NewCenturyMediaCo.com — were all registered on the same date (September 10, 2009) and that they were registered only six days <u>after</u> the SEC served subpoenas on Spongetech and the defendants MICHAEL METTER and STEVEN MOSKOWITZ.

_____

[12] "Private domain name registrations" do not publicly reveal the registrant's name and contact information.

17

36.   The five domain names identified above were registered by an individual referred to herein as "GS," who at all relevant times operated a marketing company at his residence in Brooklyn, New York.  As part of his marketing business, GS designed, created, and published Internet websites.[13]

37.   In response to an SEC subpoena, GS wrote an October 23, 2009 letter to the SEC, explaining how he came to create websites for the five customers:

> In February or March 2009, I was requested to design a website for each of [the five customers] by a man named Richard Heller, who I did not know.  I have no idea whether he has any connection with Spongetech and have not spoken with him since last summer.  After registering and desiging each of the sites, and obtaining phone numbers for each of the companies, I was not paid at all by the companies or anyone else. . . .  I am not involved whatsoever with the companies, don't know what they do and have no continuing contact with them.

38.   One week later, on October 30, 2009, GS provided sworn testimony to the SEC.  GS explained that he met Heller in February or March 2009 in the elevator of the building in which Spongetech's offices are located.  GS was visiting Spongetech at the time to solicit marketing work.  According to GS, Heller overheard GS discussing GS's ability to create websites.  Heller

---

[13] GS has also operated a stock promotion website called "nohypenobull.com," which has at times prominently provided information about Spongetech, including some of Spongetech's press releases.

allegedly told GS about five overseas companies that, according
to Heller, did not have a presence on the Internet and were
having trouble handling a large number of incoming phone calls.
GS further testified that Heller then hired GS to create websites
for those companies.  As he did in his October 23, 2009 letter,
GS denied during his SEC testimony that he knew in February or
March 2009 that Heller had any connection to Spongetech.  GS also
testified that after his elevator meeting with Heller, he had no
contact with him — or with Spongetech — about the websites, and
that although Heller promised to pay $1,000 for each website, GS
was never actually paid for his website work.[14]

39.  Records produced in response to SEC subpoenas
confirm that, assuming GS actually met with Heller in February or
March 2009, GS did not actually register the domain names until
six months later — on September 10, 2009 — and, as noted
previously, only six days after the SEC served subpoenas on
Spongetech and the defendants MICHAEL METTER and STEVEN
MOSKOWITZ.

40.  On September 28, 2009 — one month before GS's SEC
testimony — an individual sent an email to the defendant STEVEN
MOSKOWITZ.  In the email, the individual referenced
www.duabiexportimportco.com/catalogue.htm and then asked whether

_____

[14] Heller founded RM Enterprises.  He died in May 2009, a
few months after his purported elevator meeting with GS.

MOSKOWITZ believed the website page to be "fake."  The individual also wrote in the email that the individual was "hoping it is not your [web]site or set up by [S]pongetech."  Soon after receiving the individual's email, MOSKOWITZ forwarded it to GS and wrote only "See e mail (sic) below."  GS replied, "What does all of this mean?"  MOSKOWITZ then asked GS, "[w]ho's (sic) [web]site is that below."  In response, GS stated "[t]hat is the [web]site . . . . its (sic) a link to products."  MOSKOWITZ later wrote that the website "[l]ooks nice."

41.   On or about September 1, 2009, the defendant STEVEN MOSKOWITZ wrote a $10,000 check from RM Enterprises to GS. Two weeks later, on or about September 16, 2009, MOSKOWITZ wrote a $5,000 check from RM Enterprises to GS.  As noted previously, at all relevant times a large percentage of Spongetech's voting stock was owned by RM Enterprises, which is controlled by Frank Lazauskas, the defendant MICHAEL METTER, and MOSKOWITZ.  GS cashed both RM Enterprises checks.

42.   *Customer offices*.  GS also created virtual offices for the five companies.[15]  Documents obtained from Davinci Virtual Office Solutions ("Davinci") reveal that on or about

_____

   [15] A "virtual" office is a combination of off-site live communication and address services that often allow users to reduce traditional office costs while maintaining business professionalism.

September 22-23, 2009, GS arranged for virtual offices to be created by Davinci in the following United States cities:

| Customer | Virtual Office Location |
|---|---|
| SA Trading Company | Miami, FL |
| US Asia Trading | Los Angeles, CA |
| Dubai Export Import Company | Atlanta, GA |
| New Century Media | Bridgewater, NJ |
| Fesco Sales Corp. | New York, NY |

43.   Documents obtained from Regus, another virtual office provider, reveal that on or about and between September 24 and 28, 2009, GS arranged for virtual offices to be created by Regus in the following United States cities, and GS provided the following contact names:[16]

| Customer | Virtual Office Location | Contact Name |
|---|---|---|
| SA Trading Company | Miami, FL | Carlos Vega |
| US Asia Trading | Dallas, TX | Steven Chin |
| Dubai Export Import Company | Boston, MA | Ahmed Elsayed |
| New Century Media | Paramus, NJ | Helen Simms |
| Fesco Sales Corp. | New York, NY | Jim Rogers |

---

[16] In April 2010, the FBI performed public records checks for the five purported customers, searching for such entities within the states identified by Spongetech.  The searches yielded no positive results.  (Virtual offices are not detected in such databases.)  During GS's SEC testimony, he admitted that most, if not all, of the virtual office contact names he provided to Regus were fictitious.

44.   Early in the morning on September 28, 2009, the defendant MICHAEL METTER sent an email to GS with the subject line "phone calls and numbers needed." After beginning the email with GS's first name, METTER wrote as follows:

> It is very important that you contact me with the numbers that Steve said you were going to supply for the regulators. Also the phonenumber (sic) Barry gave me is not going through as I tried to call you first. The two or three numbers are needed since I can't reach Steven today because of the holiday.

Based on the context of the email, it is apparent that "Steve" or "Steven" is the defendant STEVEN MOSKOWITZ, and "Barry" is Barry Kolvezon, a Spongetech manager. Subsequent email correspondence indicates that METTER was requesting the information from GS in order to give it to the SEC, obtained the information he was seeking, and caused it to be provided to the SEC.

B.   Purchase Orders

45.   In or about late 2009, Spongetech furnished — pursuant to an SEC subpoena — numerous purchase orders purportedly issued to Spongetech by SA Trading Company, US Asia Trading, Dubai Export Import Company, New Century Media, and Fesco Sales Corp.[17] An examination of these purchase orders, however, reveals that they contain common characteristics that

---

[17] Despite reporting significant sales in 2009 to Dubai Export Import Company and Fesco Sales, Spongetech produced only two Fesco Sales purchase orders for that year (totaling $2.85 million). Spongetech did not produce any Dubai Export Import Company purchase orders for 2009.

strongly suggest that they are fake and that they were created by the same person(s).  For example:

46.  *Capitalization of first words of addresses*.  Purchase orders from all five of the purported customers have errors relating to the capitalization of the first word in the customer's own address.  For example, numerous US Asia Trading purchase orders have a letterhead address of "port of Elizabeth" in Elizabeth, New Jersey.  Similarly, numerous SA Trading Company purchase orders have a letterhead address of "port of Miami" in Miami, Florida.

47.  *Street addresses*.  The purchase orders for SA Trading Company and US Asia Trading, as well as one purchase order from Dubai Export Import Company and one from New Century Media, fail to provide a street address for the purported customers.  Instead, they list only a shipping address located at a domestic sea port or airport, such as "port of miami dock 37," "port of Elizabeth," "Airport Freight Terminal," or "port of Elizabeth."

48.  *Zip codes*.  Purchase orders from all five of the purported customers have incorrect or nonexistent zip codes in the customer's own address.  For example, certain SA Trading Company purchase orders indicate that its zip code in Miami, Florida, is 84765.  That zip code, however, is for Santa Clara, Utah.  Similarly, many of the US Asia Trading purchase orders

indicate that its zip code in Elizabeth, New Jersey, is 08473, as does at least one New Century Media purchase order. But the United States Postal Service online database contains no entry for zip code 08473.[18]

49. *Contact persons.* Some purchase orders contain names and signatures of individuals who, according to GS's sworn SEC testimony, are fictitious. For example, a Fesco Sales purchase order contains a "Jim Rogers" signature. Similarly, numerous purchase orders list "Steven Chen" (not "Steven Chin") as a contact person. As noted previously, GS has admitted under oath that these contact persons are fictitious.[19]

50. *Purchase order numbers.* Some of the five purported customer purchase orders have the same purchase order number, even though the orders span long periods of time and appear to be separate. For example, 20 US Asia Trading purchase orders that span a period from November 2007 through January 2009 have the same purchase order number (#5252007). Similarly, 17

---

[18] Elizabeth has zip codes 07201 through 07208, and Port Elizabeth is located in zip code 08348.

[19] Despite the fact that GS has admitted under oath that most, if not all, of the contact names are fictitious, the defendants MICHAEL METTER and STEVEN MOSKOWITZ claimed during their SEC testimony that they had met and spoken with one or more of these "persons." For example, METTER testified that he actually met Ahmed Elsayed (Dubai Export Import Company), with the meeting occurring at an automobile trade show. MOSKOWITZ testified that he recently spoke with Carlos Vega (SA Trading Company), Steven Chin (US Asia Trading), and Mr. Elsayed.

SA Trading Company purchase orders that span a period from April 2007 to March 2009 have the same purchase order number (#4272007).

C.   <u>Proof of Payment</u>

51.   In testimony before the SEC, the defendants MICHAEL METTER and STEVEN MOSKOWITZ maintained that the sales to the five purported customers were real, and that the customers had actually paid Spongetech for the sales.  In or about January 2010, Spongetech furnished bank records purporting to represent wire transfer payments received from the five customers.  An examination of these bank records, however, reveals that they contain certain information that strongly suggest that they do not constitute valid proof of payment by the customers to Spongetech for its products.  For example:

52.   *RM Enterprises*.  The bank records relate to an RM Enterprises bank account, and not to Spongetech, and there is no evidence that the five purported customers paid Spongetech through RM Enterprises.  (Indeed, none of purchase orders furnished by Spongetech mentions RM Enterprises.)

53.   *Payer names*.  None of payments was made by an entity containing the name of one of the five purported customers.  In fact, at least eight of the payments appear to have been made by individuals.  Furthermore, many of these

purported payments were made from accounts in foreign countries, including Hungary, Panama, Switzerland, and the Bahamas.

54. *Stated payment purposes*. Some of the payments contain references to purposes other than sales. For example, two wire transfers contain a note stating "investment share purchase."[20]

55. *Cumulative amount of payments*. The total amount of the payments for which Spongetech attempted to provide proof is only approximately $4 million.[21] As noted previously, Spongetech claimed in its SEC Form 10-QSB for the quarter ended February 28, 2009, that it sales of approximately $31 million, approximately 99% of which Spongetech claimed was from the five purported customers.

II. <u>Other Evidence</u>

    A. <u>Value of Products Purchased by Spongetech for Subsequent Sale to Customers</u>

56. At all relevant times, Spongetech's primary sponge supplier was Dicon Technologies LLC ("Dicon"). According to Dicon, Spongetech ordered sponges from Dicon that cost Spongetech approximately $750,000 in 2008 and $1.5 million in 2009. Dicon has estimated that the retail sales value of these sponges would

---

[20] Most, if not all, of the wire transfer notes are in a foreign language. For the purposes of this complaint and affidavit, only a general translation was conducted.

[21] These amounts were for payments supposedly made from November 2007 through July 2009.

26

be three times their cost to Spongetech, or approximately $2.25 million in 2008 and $4.5 million in 2009.

57. Dicon has also indicated that during the relevant time period it was Dicon's understanding that there were only two other companies supplying products (not necessarily sponges) to Spongetech, and Dicon has estimated that Spongetech ordered no more than approximately $200,000 of products from these companies, or $600,000 in retail sales value.

58. The total retail sales value of all of these Spongetech purchases is significantly less than the amount of sales publicly reported by Spongetech.[22]

B. **Dicon's Inquiries with Spongetech about the Five Purported Customers**

59. In July 2009, Spongetech acquired Dicon. Prior to the acquisition, a Dicon representative met with the defendant STEVEN MOSKOWITZ to review Spongetech's SEC filings. The Dicon representative asked MOSKOWITZ about the nature of the sales reported by Spongetech. MOSKOWITZ informed the Dicon representative that Spongetech had a substantial amount of international sales of products other than sponges, such as spot remover pens. The Dicon representative then asked MOSKOWITZ to identify any other companies — other than Dicon and the two other

---

[22] In its SEC Form 10-KSB for the year ended May 31, 2008, Spongetech stated that "[s]ales and services are recorded when products are delivered to the customers."

known suppliers — that supplied Spongetech with sponges. MOSKOWITZ did not answer the question.

60.   Sometime after Spongetech acquired Dicon, the same Dicon representative discussed above learned about press accounts that called into question the validity of Spongetech's sales figures.  The Dicon representative then contacted the defendant STEVEN MOSKOWITZ and asked him about Spongetech's international sales.  MOSKOWITZ gave the Dicon representative vague assurances about the validity of the sales, but provided no further information.

61.   Sometime later, the Dicon representative approached the defendant MICHAEL METTER and asked him about Spongetech's international sales.  In response to the inquiry, METTER lost his temper and threatened the Dicon representative: "Mind your own business.  If you know what's good for you, you'll keep your mouth shut."

<u>CONCLUSION</u>

62.   Given the confidential nature of this continuing investigation, I respectfully request that this complaint and affidavit be maintained under seal until this court or another court of competent jurisdiction orders otherwise, except that Special Agents of the FBI may disclose this complaint and affidavit and the arrest warrant as necessary to effectuate the arrest and arraignment of the defendants.

28

WHEREFORE, your deponent respectfully requests that the defendants MICHAEL METTER and STEVEN MOSKOWITZ be dealt with according to law.

THOMAS MCGUIRE
Special Agent
Federal Bureau of Investigation

Sworn to before me this
3rd day of May, 2010

United States Magistrate Judge
Eastern District of New York

29